**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CHIQUITA LAFAYE CAMPBELL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:15-CV-3913-N (BH)** |
| | § | |
| **NANCY A. BERRYHILL, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for issuance of findings, conclusions, and recommendation.  Before the Court is *Plaintiff's Brief*, filed April 14, 2016 (doc. 15); *Commissioner's Brief*, filed May 17, 2016 (doc. 19); and *Plaintiff's Reply to The Commissioner's Brief – Corrected*, filed May 24, 2016 (doc. 21).  Based on the relevant findings, evidence, and applicable law, the Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further administrative proceedings.

## I.   BACKGROUND[1]

### A.   Procedural History

Chiquita Lafaye Campbell (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act (Act).  On August 24, 2010, she applied for

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

[2]  At the time of the initial filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

disability and DIB, alleging disability beginning May 1, 2008.[3]  (R. at 479-85, 508.)  Her claim was initially denied on December 20, 2010, and upon reconsideration on May 25, 2011.  (R. at 355-56, 360.)  On June 22, 2011, she requested a hearing before an administrative law judge (ALJ).  (R. at 388-89.)  She appeared *pro se* and testified at a hearing on April 19, 2012.  (R. at 278-85.)  The ALJ denied Plaintiff's applications on June 6, 2012, finding her not disabled.  (R. at 260-69.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council, and it granted review. (*See* R. at 374.)  On April 6, 2013, the Appeals Council vacated the decision of the ALJ and remanded the case to "offer the claimant an opportunity for a hearing, [and to] take further action needed to complete the administrative record and issue a new decision."  (R. at 374-76.)

On April 10, 2014, Plaintiff appeared with an attorney and testified at a hearing before the ALJ.  (R. at 243-77.)  The ALJ again denied Plaintiff's application on May 27, 2014, finding her not disabled.  (R. at 221-38.)  Plaintiff timely appealed the ALJ's decision to the Appeals Council and submitted new evidence, which consisted of medical records from Parkland Memorial Hospital (Parkland).  (R. at 8-57, 67-220, 596-600.)  The Appeals Council denied her request for review, and the ALJ's decision became the final decision of the Commissioner.  (R. at 1-4.)  Plaintiff timely appealed the Appeals Council's decision under 42 U.S.C. § 405(g).

**B.**   **Factual History**

**1.**   **Age, Education, and Work Experience**

Plaintiff was born on July 12, 1973, and was 40 years old at the time of the second hearing on April 10, 2014.[4]  (R. at 237, 245.)  She graduated from high school and had two years of college.

---

[3]  Although the ALJ's June 12, 2012 decision noted that Plaintiff filed her application on August 12, 2010, (R. at 360, 369), the application appears to be dated August 24, 2010, (R. at 479-85, 508).

[4]  Plaintiff was 38 years old at the time of the first hearing on April 19, 2012.  (R. at 280-81.)

(R. at 245.)  Plaintiff previously worked as a home health provider (354.377-014, medium, semi-skilled), sales associate (915.467-010, medium, semi-skilled), telemarketer (299.357-014, sedentary, semi-skilled), and a valet driver (359.673-010, light, semi-skilled).  (R. at 237.)

### 2.    Medical, Psychological, and Psychiatric Evidence

On October 19, 2007, Plaintiff was admitted to Dallas Regional Medical Center (Dallas Regional) in Mesquite, Texas, with a complaint of upper extremity numbness and left-sided chest pains.  (R. at 612.)  She reported a history of hypertension.  (*Id.*)  A 2D echocardiogram revealed an ejection fraction of 62 percent.  (*Id.*)  The doctors diagnosed Plaintiff with chest pain but ruled out myocardial infarction and hypertension.  (*Id.*)  After an extensive work up, the doctors found no final etiology for the left upper extremity numbness and weakness.  (*Id.*)  She was discharged on October 24, 2007.  (*Id.*)

On September 15, 2008, Plaintiff was admitted to Dallas Regional with a complaint of chest pain.  (R. at 603.)  She reported an episode of chest pain, which was relieved with medication.  (*Id.*)  She was diagnosed with chest pain with no evidence of ischemia, probable gastroesophageal reflux disease with reflux symptoms, a history of hypertension, a history of hyperlipidemia, anxiety episode, and lymphocytosis.  (R. at 603-04.)  On September 18, 2008, Plaintiff reported that she was doing better with no distress, chest pain, shortness of breath, or palpitations, and she was discharged that day.  (R. at 603.)  She was prescribed Zocor, Habitrol, Xanax, Protonix, Lopressor, Prinivil, Aspirin, Norvasc, and Hydrodiuril.[5]  (R. at 604.)

On August 18, 2010, Plaintiff presented to the Parkland Health & Hospital System (Parkland) emergency room with leg pain and swelling.  (R. at 860.)  An ultrasound revealed an

---

[5] Hydrodiuril is also identified as HydroDIURIL in the record.  (*See* R. at 227, 604.)

extensive venous clot, and she was admitted for treatment.  (R. at 861.)  The doctors started Plaintiff on a Heparin drip and placed her on strict bed rest.  (*Id.*)  On August 19, 2010, a CT scan of Plaintiff's abdomen and pelvis was performed, which showed free fluid in the right lower quadrant and evidence of deep venous thrombosis in the left common femoral vein.  (R. at 859-61, 956-59.) Plaintiff underwent an angiojet thrombectomy, venogram, angioplasty, and endovascular stent placement.  (R. at 861.)  She had improved movement of her foot and improved sensation to light touch.  (*Id.*)  She completed a post-operative course of physical and occupational therapy and pain control.  (*Id.*)  She was discharged on August 25, 2010, and her discharge summary noted that she had no further need for therapy as an out patient.  (*Id.*)  Plaintiff went to Parkland between September 13, 2010 and February 7, 2011, for monitoring of her INR and adjustment of her Warfarin dosage.  (R. at 1483-86.)

On December 16, 2010, non-examining state agency medical consultant (SAMC) Roberta Herman, M.D., reviewed Plaintiff's medical records and completed a case assessment form.  (R. at 970.)  She found that Plaintiff had medically determinable impairments of micro valve prolapse, deep vein thrombosis, fainting spells, and hypertension, but that her statements were "not wholly credible."  (R. at 970.)

On January 6, 2011, Plaintiff was seen at Texas Regional Medical Center's emergency room in Sunnyvale, Texas, with moderate vaginal bleeding.  (R. at 872-82, 985.)  Plaintiff was diagnosed with an ovarian cyst, prescribed pain medication, and discharged.  (R. at 972.)  A bilateral lower extremity ultrasound was performed on February 18, 2011, which showed no evidence of significant stenoses or occlusions.  (R. at 984.)

On May 24, 2011, non-examining SAMC James Wright, M.D., completed a case assessment

form.  (R. at 1000.)  He noted that Plaintiff reported worsening ovarian cancer, but the medical records indicated an ovarian cyst that had ruptured and was addressed.  (*Id.*)

On June 14, 2011, Plaintiff was evaluated at Parkland for a pelvic mass.  (R. at 1481.)  Her evaluation revealed a mild diffuse abdominal discomfort and a palpable left adnexal mass.  (R. at 1481-82.)  She was diagnosed with a suspected left adnexal mass, constipation, a history of left lower extremity deep venous thrombosis, hypertension, and mitral valve prolapse.  (R. at 1482.)

On June 21, 2011, Kyler Elwell, M.D., completed a Medical Release/Physician's Statement, which opined that Plaintiff's disability was not permanent and was expected to last six months or less.  (R. at 1001.)  Dr. Elwell diagnosed Plaintiff with an adnexal mass and opined that she could not work.  (*Id.*)

A pre-operative evaluation was performed at Parkland for Plaintiff on August 12, 2011.  (R. at 1463.)  She reported a history of mitral valve prolapse and myocardial infarction.  (*Id.*)  The evaluation revealed a 2/6 systolic murmur with regular rate, and an EKG showed no evidence of a myocardial infarction.  (R. at 1465-66.)  Plaintiff was prescribed an increased dosage of Lisinopril for better blood pressure control, and was cleared for surgery.  (R. at 1466.)

On August 16, 2011, Plaintiff reported an ongoing right lower quadrant pain and depression to Virginia Fant Weathers, M.D., at Parkland.  (R. at 1459.)  An evaluation revealed voluntary guarding and discomfort over the right lower quadrant.  (R. at 1459-60.)  She was prescribed Zoloft and referred to psychiatry.  (R. at 1460.)

On October 21, 2011, Plaintiff underwent an intraoperative consult for a small bowel enterotomy, a total abdominal hysterectomy, a right salpingo-oophorectomy, a left oophorectomy, extensive lysis of adhesions (greater than 50% of the procedure), a right ureterolysis, a small bowel

resection with side-to-side reanastomosis, and an appendectomy.  (R. at 1438.)  She was discharged on October 27, 2011, and readmitted on November 1, 2011, for nausea, vomiting, sweating, and dizziness.  (R. at 1404.)  Plaintiff was treated for acute renal failure due to dehydration and partial versus developing small bowel obstruction, and was discharged on November 6, 2011.  (R. at 1013, 1364, 1383.)

On November 11, 2011, Plaintiff underwent a CT scan of her chest to evaluate for pulmonary emboli.  (R. at 1072.)  The test revealed no pulmonary emboli, but mild bronchial wall thickening.  (*Id.*)

Plaintiff was admitted to a gynecology oncology clinic on December 6, 2011.  (R. at 1363.)  She reported "doing well."  (*Id.*)  On December 14, 2011, Plaintiff underwent removal of an IVC filter, which was successfully completed without complications.  (R. at 1069, 1360.)

Patrick Molitor, M.D., conducted a psychiatric evaluation of Plaintiff at Parkland on February 14, 2012.  (R. at 1349-53.)  He observed that Plaintiff's mood was "sad" with congruent, often tearful affect.  (R. at 1352.)  She reported increased symptoms of depression, hearing "whispers," and having an imaginary friend, Kiki, with whom she talked.  (R. at 1350.)  Dr. Molitor noted that Plaintiff used marijuana on a daily basis.  (R. at 1350, 1352.)

On March 6, 2012, Plaintiff returned to Parkland with a chief complaint of abdominal pain.  (R. at 1343.)  It had lasted for two weeks, and she described it as "sharp, intermittent and rated 10/10 on a pain scale when present."  (*Id.*)  She was diagnosed with epigastric pain and prescribed Pantoprazole and Sucralfate.  (R. at 1346.)

Plaintiff again met with Dr. Molitor on March 13, 2012.  (R. at 1337.)  She reported continued depression, feeling that her life was not worth living, and hearing voices.  (*Id.*)  Dr.

6

Molitor noted that Plaintiff's history was consistent with post-traumatic stress disorder (PTSD) due to prior physical abuse and threats.  (R. at 1337-38.)  He diagnosed PTSD, insomnia, and a major depressive disorder.  (R. at 1339.)

On April 10, 2012, Plaintiff reported to Dr. Molitor continued marijuana use and that she heard negative voices.  (R. at 1333.)  He noted that Plaintiff's behavior was cooperative and pleasant, and that her thought process was linear.  (R. at 1335.)  He increased her Abilify dosage and referred her to Metrocare for further services.  (R. at 1336.)

On April 4, 2012, Plaintiff went to Parkland with a chief complaint of continued abdominal pain at a level of 7/10, and she was prescribed four medications for treatment of her epigastric abdominal pain, upper respiratory infection, and anxiety.  (R. at 1329-32.)

Plaintiff returned to Parkland on May 18, 2012, and met with Deanna Lee Dial, D.O.  (R. at 1324.)  Plaintiff reported that she was unable to get an appointment at Metrocare, that her mood fluctuated, and that she continued to have an imaginary friend "whom she talk[ed] to and talk[ed] back to her."  (*Id.*)  She  also claimed to see her imaginary friend.  (*Id.*)  Dr. Dial noted Plaintiff's mood was depressed with a congruent and tearful affect.  (R. at 1325.)  She prescribed Wellbutrin and instructed Plaintiff to continue her other medications.  (R. at 1326.)

On May 31, 2012, Plaintiff again met with Dr. Dial.  (R. at 1320.)  Plaintiff reported continued violent nightmares and a fear of people.  (*Id.*)  Dr. Dial increased Plaintiff's dosage of Wellbutrin and Buspar and referred her for therapy.  (R. at 1322.)

On September 22, 2012, Plaintiff visited Parkland's emergency room with complaints of chest and abdominal pain, nausea, vomiting, and vaginal bleeding, and she was examined by Kevin C. Walters, M.D.  (R. at 1308-09, 1311.)  He noted her history of H. Pylori gastric ulcers and his

7

concern for bleeding ulcers.  (*Id.*)  On January 12, 2013, Plaintiff  was admitted to Parkland with a chief complaint of abdominal pain.  (R. at 1283.)  She was diagnosed with chronic abdominal pain, constipation, and an H. Pylori ulcer.  (R. at 1285.)

On February 26, 2013, Plaintiff completed a psychosocial assessment at ABC Behavioral Health (ABC).  (R. at 1043-55.)  On February 28, 2013, Deborah Way, QMHP-CS, competed a treatment plan for Plaintiff.  (R. at 1040-42.)

On March 8, 2013, Plaintiff returned to Parkland with a complaint of abdominal pain.  (R. at 1270.)  She described it as "intense," sudden 10/10 pain that lasted for 60 seconds, and it occurred 10-15 times per day and was accompanied by nausea and vomiting.  (*Id.*)

On March 11, 2013, Plaintiff had a psychiatric evaluation at ABC with Kathleen Sheehan, M.D.  (R. at 1037.)  Dr. Sheehan reported that Plaintiff was well-groomed, oriented, friendly, and relaxed and had a normal rate of speech and tone.  (*Id.*)  She also reported that Plaintiff was of average intelligence and that her thought process was well-organized.  (R. at 1037-38.)  Her mood, however, was depressed.  (R. at 1037.)  Dr. Sheehan diagnosed Plaintiff with Bipolar II and a panic disorder.  (R. at 1038.)

On March 25, 2013, Plaintiff underwent a IR thrombolyzes procedure, which found that her left lower extremity venogram demonstrated occlusion of the left common iliac venous stent.  (R. at 1062.)

On April 10, 2013, Plaintiff had an x-ray of her left ankle at Parkland, which found osseous fragments along the talus and osteopenia with degenerative changes.  (R. at 1060.)  According to Humaira Moten, M.D., the fragments were consistent with a history of prior fractures.  (*Id.*)

On April 15, 2013 and April 29, 2014, Plaintiff had  follow-up  appointments  with  Dr.

Sheehan at ABC.  (R. at 1028, 1031.)

### 3. April 19, 2012 Hearing Testimony

On April 19, 2012, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 278-85.)  Plaintiff was not represented by an attorney.  (R. at 280.)

Plaintiff testified that she was 38 years old and graduated from high school.  (R. at 280-81.) She also testified that she was married and had three children.  (R. at 281.)  She had not worked since May 2008, because "that's when [her] health started to go[] bad."  (*Id.*)  She had been diagnosed with H. Pylori, a bacterial infection; anxiety attacks; "a little schizophrenia"; deep vein thrombosis; a blood disorder; blood clots; and torn ligaments and tendons.  (R. at 281-84.)  As a result, she was in a "tremendous" amount of pain every day, especially in her stomach, and she fainted for no reason.  (R. at 282-83.)  She also had thoughts of suicide that were "getting kind of worse."  (R. at 283.)  Plaintiff testified that she "faint[ed] for no reason whatsoever," so her niece stayed with her at times and that her husband checked on her during the day.  (R. at 282.)

Plaintiff testified that her doctors did not want her to sit or stand for too long because of her blood clots.  (*Id.*)  When questioned by the ALJ about what she did all day if she could not sit or stand for too long, Plaintiff testified that "I move around. . . . I get up and maybe let the dogs out or get up and go talk to my doctor. I just kind of move to different places in the house; I don't go out." (R. at 282-83.)  When asked whether she could still work as a home health aide, Plaintiff stated that "I just fear of my knees giving out or fainting, dropping someone."  (R. at 284.)  She stated that she could not lift because of the pain in her stomach.  (*Id.*)

The ALJ asked the VE whether there was any past relevant work that Plaintiff could perform, "assuming the claimant could do heavy work."  (R. at 283.)  The VE responded yes.  (*Id.*)  The VE

identified Plaintiff's past work was as a cashier, home health aide, fast food worker, telemarketer, teller, and parking attendant. (R. at 283.) Plaintiff's most recent position was as a fast food worker, which was light with SVP: 2, but she only worked in that position for two months. (*Id.*) Prior to her work as a fast food worker, Plaintiff worked as a home health aide. (*Id.*)

### 4.     April 10, 2014 Hearing Testimony

After the case was remanded from the Appeals Council, Plaintiff, a medical expert (ME), and a VE testified at a hearing on April 10, 2014. (R. at 243-77.) Plaintiff was represented by an attorney. (R. at 245.)

#### a.     *Plaintiff's Testimony*

Plaintiff testified that she was 40 years old, graduated from high school, and had two years of college. (R. at 245.) She was married and had three children. (*Id.*) Plaintiff was licensed as a Certified Nursing Assistant in 1996. (R. at 257.) She took classes to become a Registered Nurse (RN) from 2001 and 2002, before her alleged onset date, but dropped out of the program because she was in an abusive marriage. (R. at 258.) She never finished her studies to become an RN. (*See* R. at 257-58.) She had not worked since May 1, 2008. (R. at 245.)

Plaintiff was diagnosed with PTSD and depression, which caused her to feel "unwanted" and scared to go outside. (R. at 247-48.) She also did not socialize and had problems concentrating. (R. at 248.) She had problems with her legs, which included "constant" swelling; a lot of bruising; and severe, throbbing, and aching pains. (R. at 249.) She had trouble putting weight on her legs. (*Id.*) In response to a question by the attorney regarding how she relieved pain in her legs, Plaintiff explained that she elevated her legs and moved. (*Id.*)

According to Plaintiff, her husband did the shopping, and she only left the house for doctor's

10

appointments.  (R. at 256.)  She "[s]ometimes" made sandwiches, but she did not cook meals.  (*Id.*)  She made the bed and picked up things around the house, but nobody cleaned the house.  (*Id.*)  In response to a question by the attorney regarding her ability to work at a desk, Plaintiff responded that the pain affected her "ability to do anything, period."  (R. at 257.)

> b.      *ME's Testimony*

The ME testified that Plaintiff had been diagnosed with bipolar I or II, PTSD, substance abuse, depression, and anxiety.  (R. at 251.)  He opined that the paragraph A criteria for seriousness of a mental disorder was met.  (*Id.*)  The ME explained that the reports for Plaintiff stated that she had "a tendency to magnify and exaggerate [her] symptoms" and to act out, such as when she shot herself.  (R. at 251, 261.)  He opined that she could "relate with people, although it's habitually in this kind of depressive debasing way."  (R. at 256.)  The ME also opined that, based on Plaintiff's answers to the ALJ's questions, her activities of daily living were mild to moderate, but not at a severe or marked level.  (R. at 259.)  He likewise opined that Plaintiff's concentration, persistence, and pace were mild to moderate, but not at a severe or marked level.  (*Id.*)

In response to questions by the attorney and the ALJ about Plaintiff's employability and other doctors' evaluations, the ME opined that he would need additional corroborating evidence to testify about whether Plaintiff could work.  (*See* R. at 260.)  He would need to spend three months with Plaintiff to make a determination about her ability to work, which would permit him to opine more precisely about his retrospective opinions.  (R. at 260, 262.)  He also explained that future treatment records, even though they reflected Plaintiff's condition after the date she was last insured, would still be beneficial because "it's not like there's an on/off switch that these behaviors or diagnoses change like that, so that if [her therapist] were to find some things even afterwards,

11

particularly things like major depressive disorder, or certainly [PTSD] or bipolar, [they] tend to spill over or . . . be present before the time that they're treating a person." (R. at 276.)

### c.      VE's Testimony

The ALJ asked the VE whether Plaintiff could be employed if she elevated her legs for half of the day. (R. at 263, 267.) The VE responded that Plaintiff could not elevate her legs for that amount of time and still be employed. (R. at 264.) The ALJ then asked the VE whether a person who could accept instructions, attend and concentrate for two-hour periods, interact adequately with coworkers and supervisors, respond to changes in work setting, and adopt to a routine work environment could be employed. (*Id.*) The VE opined that such a person could be employed in unskilled work. (*Id.*)

The ALJ asked the VE whether Plaintiff had any past unskilled work that she could do. (*Id.*) The VE responded that she did not have any jobs at the unskilled level, but there were jobs that she could do. (*Id.*) The VE opined that Plaintiff could be a charge account clerk (205.367-014, SVP: 2, sedentary, unskilled), with 180,000 jobs nationally, and 4,900 jobs in Texas. (R. at 265, 595.)

### C.      **The ALJ's Findings**

The ALJ issued his decision denying benefits on May 27, 2014. (R. at 224-38.) At step one,[6] he found that Plaintiff had not been engaged in substantial gainful activity since September 30, 2012, the application date. (R. at 226.) At step two, he found that Plaintiff had the following severe impairments: mitral valve prolapse, deep vein thrombosis, hypertension, ovarian cysts, bipolar disorder, depressive disorder, adjustment disorder, PTSD, schizophrenia, schizoid personality disorder, dependent personality disorder, and drug (marijuana) abuse. (R. at 226-27.)

---

[6] The references to steps refer to the five-step analysis used to determine whether a claimant is disabled under the Social Security Act, which is described more specifically below.

He then explained that Plaintiff's chronic pain did not fulfill the definition of a medically determinable impairment.  (R. at 227.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the impairments listed in the regulations.  (R. at 229.)

Before proceeding to step four, the ALJ determined that Plaintiff had the following Residual Functional Capacity (RFC): lift and carry 50 pounds occasionally and 25 pounds frequently and stand for six hours in an eight hour workday.  (R. at 231-32.)  She also retained the ability to understand, remember, and carry out simple instructions; make decisions; accept instructions; attend and concentrate for two-hour periods; interact adequately with others, coworkers, and supervisors; respond appropriately to changes in routine work settings, and adopt to a routine work environment. (R. at 232.)  Interpersonal contact must be incidental to the work performed.  (*Id.*)  At step four, the ALJ found that Plaintiff could not perform her past relevant work.  (R. at 237.)

The ALJ continued to step five and found that transferability of job skills was not material to the determination of disability because use of the Medical-Vocational Rules as a framework supported a finding that Plaintiff was not disabled, whether or not she had transferrable job skills. (R. at 237.)  Considering her age, education, work experience, and RFC, the ALJ found there were jobs in significant numbers in the national economy that she could perform.  (R. at 238.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined under the Social Security Act, from May 1, 2008, the alleged onset date, through September 30, 2012, the date she was last insured.  (*Id.*)

D.      **New Evidence Submitted to the Appeals Council**

Plaintiff appealed the ALJ's decision to the Appeals Council and submitted new evidence

that consisted of medical records from Parkland dated from April 3, 2014 through October 23, 2014, including test and lab results and physical examination reports.  (R. at 8-57, 65-220, 286-354.)  The Appeals Council denied her request for review on October 19, 2015.  (R. at 1.)  In denying her request, the Appeals Council noted that it had looked at the new evidence, but the medical records did not affect the decision about whether she was disabled on September 30, 2012, the date she was last insured for disability benefits, because they related to a later time.  (R. at 2.)

## II.   ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.   **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *Id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.* at 436 and n.1.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

15

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**      <u>**Issues for Review**</u>

Plaintiff raises six issues for review:

(1) Is the ALJ's finding that the deep vein thrombosis in [Plaintiff's] left leg was a "severe" impairment through her date last insured facially inconsistent with his

16

finding that she has the [RFC] to sustain all of the physical requirements of "medium work"?

(2) (a) [Plaintiff] has May Thurner syndrome, a congenital ailment that causes a key leg vein to become permanently narrowed and scarred due to mechanical compression. Does the Decision's failure to consider (or mention) this condition warrant remand?

(b) [Plaintiff] contends that, due to pain and swelling in her left leg, she has difficulty standing, walking, and carrying things and must elevate her legs for hours. The ALJ's RFC finding for medium work rejects these claims. He found that, though her "honesty is not in doubt," her only lower-extremity ailment – an Aug. 2010 DVT (blood clot) – could not cause such symptoms. Given SSR 96-8p's requirement that ALJs must consider "all of the evidence" and "all of the impairments" when assessing the claimant's RFC, does it warrant remand that the Decision fails to mention any of the following: her May Thurner syndrome; that she has had "multiple DVTs;" that her stent is occluded; that she developed inoperable "post thrombotic syndrome" (PTS); that she has been referred to pain management; and that her doctors concur in her need to elevate her legs?

(3) In finding that [Plaintiff] has the RFC to sustain medium work without any lower-extremity limitations, the ALJ chiefly relied on a one-page form filled out by the state-agency physician, James Wright MD. Does it justify remand that:

    (a) The Decision describes Dr. Wright's opinion as an 8-page physical residual functional capacity assessment form concluding that Plaintiff can do "medium work," when in reality it is a one-page "medical bypass" form?

    (b) The ALJ's step-two finding rejects the only conclusion that Dr. Wright's "medical bypass" form reached;

    (c) Dr. Wright opined in May 2011, three years before the Decision date and 19 months before the date-last-insured. He therefore could not have known of her May Thurner diagnosis or other later medical information showing that her left leg is significantly and permanently impaired due to vascular disease.

    (d) The ALJ's odd view of this case was that, due to "listing-level" mental disorders, she has pain so severe that she has "moderate to marked" difficulties concentrating. Under these circumstances, is Dr. Wright's opinion substantial evidence supporting the "medium work" finding even though it does not purport to take any of her mental impairments into account?

(4) (a) Did the nonexamining psychologist whose opinion the ALJ embraced,[the ME], testify to the conclusions the ALJ attributed to him?

(b) Given that [the ME] testified that further evaluation of Plaintiff was necessary to assess her mental functioning through the date-last-insured, does the agency's failure to obtain such testing constitute a breach of its duty to develop the evidence fully and fairly?

(5) The ALJ found [Plaintiff] to be "currently" disabled under the mental-health listings, but he failed to determine her "onset date of disability." Does this warrant remand, given the rule from SSR 83-20 that the ALJ "must … establish the onset date of disability" and that "it is essential that [it] be correctly established and supported by the evidence"?

(6) In light of the ALJ's finding that [Plaintiff's] account of her symptoms was truthful, did he violate the rule against "picking and choosing" by relying on her responses to a pain questionnaire to support his finding that her pain has been severe enough to cause "moderate to <u>marked</u>" difficulties concentrating, without noticing that the same document attributes numerous *physical* limitations to her pain, and without justifying his decision to credit only the psychological effects of her pain?

(doc. 15 at 7-9) (emphasis in original).

## C.   Reconciliation of Step Two and RFC Findings

Plaintiff argues that remand is required because the ALJ erred in failing to reconcile his step two and RFC findings.  (doc. 15 at 14-15.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may

find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* They may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

As noted, at step two, the ALJ found that Plaintiff had twelve severe impairments, including deep vein thrombosis. (R. at 226-27.) The ALJ generally noted a surgery in 2010 related to evidence of deep vein thrombosis in Plaintiff's left common femoral vein, which was followed by physical therapy. (*See* R. at 227.) After finding that she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the regulations, the ALJ found that Plaintiff had a RFC to lift and carry 50 pounds occasionally and 25 pounds frequently, stand for six hours in an eight hour work, walk for six hours in an eight hour

workday, and sit for six hours in an eight hour workday.  (R. at 229, 231-32.)  Also, Plaintiff retained the ability to understand, remember, and carry out simple instructions; make decision; accept instructions; attend and concentrate for two-hour periods; interact adequately with others, coworkers, and supervisors; respond appropriately to change in routine work settings; and adopt to a routine work environment.  (R. at 232.)  The ALJ also found that Plaintiff's interpersonal contact must be incidental to the work performed, however.  (*Id.*)

The purpose of assessing a claimant's RFC is to determine the work that can be done despite present limitations.  *See Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam); 20 C.F.R. § 404.1545(a).  Federal courts in Texas have found that when impairments are identified as severe at step two but an RFC does not include any limitations, the RFC in effect contradicts the step two finding.  *See Walker v. Colvin*, No. 3:14-CV-1498-L, 2015 WL 5836263, at *15 (N.D. Tex. Sept. 30, 2015) (citing cases); *Spears v. Barnhart*, 284 F. Supp. 2d 477, 483 (S.D. Tex. 2002) (noting that by failing to include any limitations, the ALJ "basically contradict[ed] the fact that he found [the claimant's] impairments to be severe"); *Norman v. Astrue*, No. SA-10-CA-849-XR, 2011 WL 2884894, at *6 (W.D. Tex. July 18, 2011) ("Similar to *Spears*, here the ALJ did not include any limitations resulting from the [impairment], contradicting his own finding that the [impairment] was 'severe.'"); *cf., Rangel v. Astrue*, No. H-08-2246, 2009 WL 2971129, at *15 & n.11 (S.D. Tex. Sept. 14, 2009) (contrasting the facts with *Spears*, the district court noted that the ALJ found the claimant's depression to be severe and assessed the appropriate mental limitations in his RFC determination for any residual effects of his depression).  This inconsistency generally warrants remand.  *See, e.g., Spears*, 284 F. Supp. 2d at 483-84 (finding the ALJ's failure to address the claimant's limitations related to her severe impairment was error that warranted remand); *Norman*,

2011 WL 2884894, at *6 (finding remand was warranted where the ALJ found the claimant's limitation was severe at step two, but failed to include any limitation resulting from the impairment in his RFC analysis); *Martinez v. Astrue*, No. 2:10-cv-0102, 2011 WL 4128837, at *7 (N.D. Tex. Sept. 15, 2011) (same), *adopted by* 2011 WL 4336701 (N.D. Tex. Sept. 15, 2011).

For example, in *Martinez v. Astrue*, an ALJ failed to include limitations resulting from a plaintiff's hand surgery in the RFC despite finding that the hand surgery was a severe impairment. *Martinez*, 2011 WL 4128837, at *5-6.  After noting that the ALJ may have made a mistake at step two or made a credibility determination regarding the claimant's limitations in deciding the RFC, the court explained that "on appellate review, [a court] cannot speculate as to what the ALJ may have considered." *Id.* at *7.  It remanded the case because it was unable to determine whether the ALJ intended the hand surgery to be a severe impairment, and if so, whether the RFC should have included certain limitations relating to it.  *Id.* at *7 (noting "this Court cannot find that the ALJ's inclusion of the . . . severe impairment was merely meaningless verbiage").

Nevertheless, "having a severe impairment is not a sufficient condition for receiving benefits under the Secretary's regulations" and "means only that [the] claimant has passed the second step of the inquiry mandated by the regulations." *Shipley v. Sec. of Health & Human Servs.*, 812 F.2d 934, 935 (5th Cir. 1987) (per curiam).  In other words, the consideration of whether a claimant's impairments are severe at step two is a different inquiry than an ALJ's assessment of the claimant's RFC.  *See Gutierrez v. Barnhart*, No. 04–11025, 2005 WL 1994289, at *9 (5th Cir. Aug. 19, 2005) (per curiam) ("A claimant is not entitled to social security disability benefits merely upon a showing that she has a severe disability. Rather, the disability must make it so the claimant cannot work to entitle the claimant to disability benefits."); *see also Boyd v. Apfel*, 239 F.3d 698, 706 (5th Cir.

2001) ("The ALJ's finding that [the claimant] had a 'combination of impairments that [were] severe' did not foreclose a finding that [the claimant] had a residual functional capacity to perform a range of light work, and is not necessarily inconsistent with that finding."); *Quigley v. Astrue*, No. 4:09-CV-402-A, 2010 WL 5557500, at *8 (N.D. Tex. Sept. 8, 2010) (noting that step two and the RFC determination are different inquiries), *adopted by* 2011 WL 61630 (N.D. Tex. Jan 5, 2011).

In cases where reviewing courts have found that an ALJ did not err in finding severe impairments at step two and not attributing any limitation to those impairments in the RFC assessment, the ALJs considered the limitations that were encompassed by the severe impairments or accounted for the limitations in some respect before making a disability finding. *See, e.g., Gonzalez v. Colvin*, No. 4:12-CV-641-A, 2014 WL 61171, at *6-7 (N.D. Tex. Jan. 6, 2014) (finding the ALJ's decision was not subject to reversal where he did not set forth specific limitations in his RFC determination relating only to the claimant's severe impairment but found other limitations that took into account the claimant's severe impairment); *Carnley v. Colvin*, No. 3:12-cv-3535-N, 2013 WL 5300674, at *9 (N.D. Tex. Sept. 20, 2013) (finding although the ALJ erred by finding claimant's seizure disorder to be a severe impairment and failing to incorporate limitations from the disorder into the RFC, it was clear he intended to include seizure limitations because the hypothetical questions posed to the VE at the hearing included such limitations, so there was no need to remand the case); *Scott v. Colvin*, No. 4:12-CV-01569, 2013 WL 6047555, at *11 (S.D. Tex. Nov. 14, 2013) (finding that the ALJ "fully addressed the impact of [the claimant's severe impairment] on her ability to do sustained work activities").

Here, the ALJ expressly found that Plaintiff's deep vein thrombosis was one of twelve severe impairment at step two, but he did not expressly address what impact, *if any*, it had in determining

Plaintiff's RFC.  (R. at 226-27, 231-37.)  Plaintiff argues that this is an inconsistency between the two findings, given the regulatory definition means that her deep vein thrombosis "significantly limit[s] [her] physical or mental ability to do basic work activities."  (doc. 15 at 14) (alterations in original) (quoting 20 C.F.R. § 404.1521(a)).[7]  In its response, the Commissioner does not disagree that the ALJ failed to expressly address Plaintiff's deep vein thrombosis in determining her RFC.  (*See* doc. 19 at 7-8.)  She instead argues that the ALJ necessarily "account[ed] for" Plaintiff's deep vein thrombosis when he limited her to medium work, since "a limitation to medium work, by itself, significantly limited Plaintiff's use of her lower extremities and accounts for her lower extremity impairments."  (*See id.* at 7-8.)

As in *Martinez*, the ALJ provided no explanation to show that he considered the severe impairment.  (*See id.* at 7-8); *see also Martinez*, 2011 WL 4128837, at *5-6 ("Without some explanation in the record as to how plaintiff can suffer from a severe impairment, *which by definition must have more than a minimal effect on plaintiff's ability to work* and why such severe impairment would not have had any limitation on plaintiff's ability to . . . [fulfill the necessary functions of] the jobs identified by the vocational expert, the decision cannot stand.") (emphasis added).  Also, Plaintiff had multiple severe impairments to be considered in the ALJ's RFC determination.  (*See* R. at 226-27, 231-37.)  Accordingly, it is unclear what the ALJ intended when he included deep vein thrombosis as a severe impairment but failed to clearly address it in his RFC determination.  Given the apparent inconsistency and the failure to reconcile the step two and RFC findings, remand is

---

[7] The Code of Federal Regulations explains that "[a]n impairment or combination of impairments is not severe if it does not *significantly limit* your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a) (emphasis added).

required on this issue.[8]  *See Walker*, 2015 WL 5836263, at *16 (finding that an ALJ's failure to resolve an inconsistency between his step two and RFC findings required remand); *Norman*, 2011 WL 2884894, at *6 (same).

### III.  RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further administrative proceedings.

**SO RECOMMENDED** this 24th day of February, 2017.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[8]  Because remand is recommended on an inconsistency between the ALJ's step two and RFC findings, and a new determination of Plaintiff's RFC on remand will likely affect the remaining issues, they will not be addressed.